## Rait *vs.* Rait.

*In the matter of the accounting of* Robert Rait, *guardian of* David Rait.

In accounting before the Surrogate, a general guardian cannot be charged with moneys received and disbursed by him *previous* to his appointment, which had been paid to him by a foreign guardian for the purpose of applying to the benefit of the minor.

Nor can a guardian, in such case, be charged in his accounts, for a contested debt, alleged to have been due by him to his ward at the time of his appointment. The Surrogate has no jurisdiction to try such a controverted claim.

In allowing the guardian for counsel fees disbursed for the benefit of his ward, he will be credited only for such sum as was a reasonable charge for the services rendered.

H. M. Western, *for D. Rait.*
B. Galbraith, *and* E. W. Stoughton, *for the Guardian.*

THE SURROGATE. Robert Rait, the paternal uncle of David Rait, became his guardian under letters issued by the Surrogate of New-York, July 22, 1844. The same day, under the same authority, he became guardian of Janet Rait, aged 8 years, Ann C., aged 12, Margaret, aged 17, and James aged 10, the brother and sisters of David. On the 13th July, 1845, he was also appointed guardian of Robert Watt Rait, aged 14 years. David arrived at age, Dec. 4, 1846, and on the 5th January, 1849, cited his late guardian to account. To this petition an answer was made, stating that a full account of the guardianship had been rendered to the Surrogate, 3d November, 1846, and that after the petitioner came of age, he examined the account, and gave the guardian a general release, and also a receipt for the sum of $107 71.

I. As to the release. Though it was executed after the ward attained his majority, yet in view of the previous relationship of the parties, the execution of the release at the time of the payment of the money acknowledged by the guardian to be due, and the consideration of the release being a balance of a particular fund or class of moneys, I am not inclined to consider the release as a bar to an account from the commencement of the guardianship. (2 *Atk.*, 15 ; 3 *Bro. P. C.*, 46 ; 1 *S. & S.*, 502 ; 1 *Vesey*, 379 ; 1 *P. Wms.*, 121 ; 1 *Ba. & Beat.*, 219 ; 7 *Paige*, 46.) It is proper for me to add, that I do not understand the guardian in this case to insist upon the ordinary legal and technical effect of the release, though it has been put in evidence.

II. Previous to taking out his letters of guardianship, Robert Rait at different times received from Joseph Gill Jump, acting as guardian of David Rait, and his brother and sisters, at Jamaica, about £668. These moneys were paid to Robert Rait "as guardian to the late Mr. Rait's children," "with no particular direction, but to appropriate generally for the benefit of the children." Robert Rait visited Jamaica, and returned to New-York in April, 1842,

bringing the children with him, except David, who did not come to New-York until October following.   The question arises under this state of facts, whether Robert Rait is bound to account before me for David Rait's share in these moneys, received by him before the letters of guardianship were issued by the Surrogate.   There can be no doubt, that at Common Law, or in equity, an entry without legal authority into the lands of an infant, as guardian, or the receipt of moneys under such a claim, puts it in the power of the infant, on attaining his majority, to treat the party as a guardian and compel him to account in that character. (*Bing. on Infancy*, 156 ; *Macpherson on Infancy*, 39, 262 ; 3 *Atk.*, 489.)   This right depends upon a clear, legal principle, and may be enforced through the medium of the Courts of Law and Equity.   Were it within my province to entertain the question, I should have great doubts as to the liability of Mr. Rait to account for the moneys received by him from the guardian in Jamaica, before he was appointed guardian here, on the ground that in receiving and disbursing these moneys, he was only acting as the agent of, and, therefore, only responsible to the foreign guardian. The privity was between him and Mr. Jump, and the remedy for the misapplication of the fund would primarily follow the privity of contract.

But as my jurisdiction in this matter is entirely statutory, I am inclined to think my authority to compel a guardian to account is limited to an account of his proceedings under the power given him by his letters ; is commensurate, in fact, with acts, or neglects of duty occurring during the period of his official authority, and cannot be extended back to previous transactions.   It is urged, however, that David Rait's share of these moneys previously received, was actually in the hands of Robert Rait at the time of receiving the letters, and his title or possession became thereby, on the instant, changed into a title or possession under his letters.   But it is very far from being proved that any of the moneys received from the foreign guardian

were actually in Robert Rait's hands at that time; he had been supporting the children for some two years, and probably had expended a large part, if not all of the fund. It is not then the case of money of the infant having an earmark, or other personal property capable of being identified, being in the guardian's possession previous to, and at the time of his appointment; but at the best, conceding Robert Rait's indebtedness to the infant at that moment, it would only be a right of action, against the individual appointed guardian. But should I proceed to investigate this claim, and to inquire whether the funds claimed by the infant had been judiciously expended and for his benefit, I would in reality be taking an account. Suppose, however, it established, that a person appointed guardian was at the time of his appointment indebted to his ward, can it be said that the debt has been realized by virtue of his guardianship? Does the assumption of the office work a transmutation of the character in which he was previously a debtor? The effect of appointing a debtor to be executor or administrator, has been to make the debts owed by them, assets in their hands. (*Williams on Executors*, 1124—1129.) This rule has been recognized by our statute. (2 *R. S.*, *p.* 148, § 14.) Unless executors and administrators are charged in this way, the debtor being the executor or administrator, and the debt being extinguished, or the remedy suspended, its collection cannot be secured in any other mode. The reason of the rule is not applicable to the case of guardians. The individual debt of the guardian is not discharged, but may be collected by the ward on his arrival at age. It is true the guardian is bound to preserve the personal property of his ward, and may be liable as well for what ought to have come into his hands, as for what has come into his hands. He ought to answer for conceded rights of action, lost or uncollected through negligence. It is a solecism to term the failure of a guardian to charge himself with a debt, claimed by the ward to have accrued before his appointment, and contested by

the guardian in good faith, an act of negligence. The demand itself is controverted, and to determine its validity, is the province of a Court of general jurisdiction. My authority is limited to an account of the guardianship, and I think it would be straining my power beyond just bounds, to draw into the account a controverted right of action, growing out of transactions antecedent to the guardianship.

In *Spedden* vs. *The State*, 3 *Harris & Johnson*, *p*. 251, the Court of Appeals of Maryland held that the Orphan's Court had no authority in settling the accounts of a guardian, to allow him for the maintenance of his ward for any period of time previous to his appointment. The ground of this decision was the want of jurisdiction to go beyond the strict relation of guardian and ward. In *Gunby* vs. *Selby*, 2 *Id.*, 244, the same Court decided that a ward, in a suit upon a guardian's bond, dated in 1797, could not prove the receipt of rents by the guardian before his appointment, in 1791. In *Clowes* vs. *Van Antwerp*, 4 *Barb. S. C.*, 416, it was held that upon the settlement of the accounts of a general guardian, the Surrogate is not authorized to make any allowance to such guardian for services rendered, or expenses incurred by him previous to his appointment, Parker, Justice, remarking, that " such services and expenses are not those of the guardian, and for the services of the guardian as such, the compensation is limited to the commissions allowed by law ; nor would it have established the claim of the appellant before the Surrogate, if he had proved a promise to pay for such services, made by the ward after she became of age. Such a promise might give a right of action in a Court of Law for personal services, but not a right to charge as guardian. In such a case it would be a promise after the guardianship ceased, to pay for services rendered before the guardianship commenced. Over such matters the Surrrogate had no jurisdiction." Two of these cases related to charges made by the guardian against the ward, but they turned upon the point of

jurisdiction; and I can see no reason why the same rule should not be applied to a contested right of action against the guardian. I must, therefore, exclude from this accounting, the questions relating to the disbursement of the moneys received from Jamaica for the children previous to the issuing of the letters of guardianship.

III. After his appointment, Robert Rait was paid by the foreign guardian £100, 17th October, 1844, and £100 December 26, 1846. The latter sum was received after David Rait came of age, and Robert Rait is not liable to account for it, before me, as guardian. For David's share in the first sum of £100, he is bound to account. It was received by him " as guardian," and while he was guardian, with instructions " to appropriate generally for the benefit of the children." David's share of it was about £16, there being six minor children for whom it was intended. He should answer for this at the current rate of Jamaica funds at that time.

IV. David Rait ceased to live with his guardian, Sept. 18, 1844. From July 22, 1844, to that date, the guardian was entitled to charge him for board, and should allow him for the value of his services as clerk, and the mutual credits would, I think, about offset each other.

V. As to the fees paid by the guardian to Mr. Stoughton, I feel some embarrassment. The propriety of the payments should undoubtedly be tested by the apparent state of circumstances as understood at the time. The amounts involved were large, the services arduous, and performed with energy and ability. Mr. Hoffman, the counsel in the case, puts the value of these professional services above the amount paid, looking at Mr. Stoughton as representing David Rait as a single party in interest. But Mr. Stoughton represented all the other parties, as to whom the proceedings were joint, and the charges made against the six infants, and paid by the guardian, amounted to the very large sum of $2250. Regarding it as a single case for a single individual, the highest sum fixed by Mr.

Hoffman does not exceed $550. In estimating the amount, he says, he would be governed in his own case by the fact of there being seven parties in interest represented. In such a case, looking at the fund, and the services and the circumstances, he says he would certainly not have charged $1750, and would certainly have charged $1000, by which last remark I do not understand him as designating the last as the proper sum. I have no doubt of the propriety and good sense of this mode of regarding the subject. Where the same counsel has appeared for parties having the same interests involved in the same questions in the same suits, the service ought to be regarded as one in estimating its value. The amount at stake was large, and though subsequent events cut off the other children from realizing any very material benefit from the proceedings, David Rait was successful in receiving some $2400, under the Surrogate's decree. In view of this fact, and with the best light I have of judging, afforded by the opinion of the eminent counsel engaged in the case who testified before me, I think $200 would have been a reasonable amount to have paid as David Rait's fair proportion of the expenses of that litigation.

There are several small sums paid by the guardian, which have not been brought into the account on file. He must have credit for such as have been paid during the period of his guardianship, and must be debited with one-sixth of the amount of the Jamaica bill of £100, and with $200, the excess of the charge for counsel fees, beyond what I have thought reasonable. On the latter item, interest ought not to be charged, as the guardian has not had the benefit of the fund, and does not appear to have acted in bad faith.